IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| | * | |
| THUAN VAN LUONG and | * | |
| MATTHEW ALLEN RAPER, | * | |
| | * | |
| Plaintiffs, | * | 4:21-cv-00214 |
| | * | |
| v. | * | |
| | * | |
| GARTH L. HOUSE, JACKSON BRUCKNER, | * | |
| and KALEB SCHULTZ, | * | ORDER |
| | * | |
| Defendants. | * | |
| | * | |

Before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 50, 55.

Both parties filed responses to the respective motions, ECF Nos. 63, 64, and replies, ECF

Nos. 65, 66.  Neither party requested oral argument, and the Court does not believe argument

will substantially aid it in resolving the pending motions.  The matter is fully submitted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

On June 1, 2020, Plaintiffs Thuan Luong and Matthew Raper and their friend Logan

Villhauer[2] were at a bar in the East Village neighborhood of Des Moines four blocks west of the

Iowa State Capitol Building where an organized protest against police violence and racial

---

[1] Defendants contend there are no disputed material facts.  ECF No. 51-1 at 16.  In contrast, Plaintiffs identify five material facts in dispute.  ECF No. 64 at 2.  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Sam's Riverside, Inc. v. Intercon Sols., Inc.*, 790 F. Supp. 2d 965, 975 (alteration in original) (quoting *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)).  "Cross motions simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  *Id.* (alteration in original) (quoting *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 170 (1st Cir. 2004)).  For purposes of this Order, the Court concludes there are no material facts in dispute and Defendants are entitled to judgment as a matter of law.

[2] Villhauer has filed suit separately.  *See Villhauer v. City of Des Moines*, No. 4:22-cv-00049 (S.D. Iowa Feb. 16, 2022).  The factual circumstances underlying both cases are the same.

discrimination was taking place in the aftermath of George Floyd's brutal murder by a Minneapolis Police Department Officer.  ECF No. 63-1 ¶ 1; *see also How George Floyd Died, and What Happened Next*, N.Y. Times (July 29, 2022), https://www.nytimes.com/article/george-floyd.html.  Following the organized protest, hundreds of people peacefully marched approximately ten blocks west from the Capitol to the Des Moines Police Department (DMPD).[3]  ECF No. 63-1 ¶ 2.  The crowd eventually made its way back to the Capitol where it was met by law enforcement officers who attempted to make them leave the Capitol grounds.  *Id.* ¶ 3.

The events related to Plaintiffs' claims occurred late on June 1 and into the early hours of June 2, which marked the fourth consecutive night of peaceful protests and unplanned rioting in downtown Des Moines.  ECF No. 64-1 ¶ 1.  In the previous nights, law enforcement officers had had various harmful objects thrown at them such as rocks, bricks, cinder blocks, empty tear gas canisters, pieces of concrete, signs, traffic cones, and bottles full of water, ice, bleach, and urine.  *Id.* ¶ 2.  The rioting also resulted in significant property damage to several buildings in the area, including this Court's own courthouse.  *Id.* ¶ 4.  In response, the Polk County Board of Supervisors held an emergency meeting and established a mandatory curfew on May 31 requiring all residents to remain at home between the hours of 9 p.m. and 5 a.m. unless they were working, traveling to or from work, experiencing a medical or family emergency, or participating in an official religious observance.  *Id.* ¶¶ 8, 9; ECF No. 50-2 at 11–12.  The Curfew Order "authorize[d] any peace officer employed thereby, when in full and distinctive uniform or

---

[3] The Court takes judicial notice of the geographical locations of the landmarks identified by the parties in this case and the distance between those landmarks in connection with the relevant events in this case.  *See, e.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a map provided by Google Maps because its "accuracy cannot reasonably by questioned" (quoting Fed. R. Evid. 201(b)); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (taking judicial notice of distance calculation that relied on information provided by Google Maps).

displaying a badge or other insignia of authority, to arrest without warrant any person violating or attempting to violate this Curfew Order in that officer's presence." ECF No. 50-2 at 13.

On the night of June 1, Plaintiffs and Villhauer left their apartment for the East Village bar around 10 or 10:30 p.m. intending to protect the bar from potential rioters and to render first aid to protestors. ECF No. 63-1 ¶ 8; ECF No. 64-1 ¶¶ 58–60. The bar was not open for business that night, and none of the three friends had been working at the bar that night. ECF No. 50-2 at 529, 534, 536, 626, 686. The friends were dressed in long sleeves and jeans to protect themselves from chemical dispersants and were prepared with a first-aid kit, water bottles, paper towels, suckers, and spray bottles containing milk of magnesia and baking soda to counteract the effects of chemical dispersants. ECF No. 63-1 ¶¶ 13, 85, 86; ECF No. 64-1 ¶¶ 57, 68, 69. None of them carried any dangerous items with them. ECF No. 63-1 ¶ 14. All three were aware the Curfew Order was in effect that night. ECF No. 64-1 ¶ 62. They first walked around the East Village neighborhood and considered joining the protest at the DMPD before retreating to the closed bar after learning the area was unsafe. *Id.* ¶¶ 64, 65, 67, 71. Once safely at the bar, Plaintiff Luong posted a warning on social media to deter people from joining the protest because it seemed dangerous. *Id.* ¶ 66. They stayed inside the closed bar waiting, socializing, and watching the news and goings on outside the bar. *Id.* ¶ 70.

There was a protest taking place at the Capitol grounds a few blocks to the east. *Id.* ¶ 37. Defendant Sergeant Garth House and his team were ordered to the area around the Capitol. *Id.* ¶ 38. The Iowa State Patrol was about to give dispersal orders when Defendant House's team arrived. *Id.* ¶¶ 39, 92. Before the dispersal orders were read, Defendant House observed people in the crowd throwing objects at officers. *Id.* ¶ 40. Law enforcement officers read five dispersal orders at the Capitol between 11:31 p.m. and 11:43 p.m. *Id.* ¶ 48. A substantial number of

people complied with the orders to disperse, several of whom traveled west. ECF No. 63-1 ¶ 6; ECF No. 64-1 ¶¶ 51, 93. Around 11:45 p.m., officers deployed tear gas to clear the crowd. ECF No. 63-1 ¶ 7; ECF No. 64-1 ¶ 50. Defendant House's team began to move west along Locust Street. ECF No. 64-1 ¶¶ 94, 98. Officers in the area were telling people they passed to leave the area, and soon most of the protestors had left the Capitol grounds. *Id.* ¶¶ 95, 97.

Upon learning that dispersal orders had been given at the Capitol and tear gas deployed, Plaintiffs and Villhauer left the bar to render aid to people who had been exposed to tear gas at the Capitol. *Id.* ¶¶ 72–74. People who had been exposed to tear gas were leaving the Capitol and a small group of three or four people sat down outside the bar to rinse their eyes with water. *Id.* ¶ 77. Other people continued to walk past the bar on East 5th Street. *Id.* ¶¶ 78, 79. Plaintiffs and Villhauer walked south and stopped near the corner of East 5th Street and Locust Avenue— approximately half a block south of the bar and four blocks west of the Capitol—to help someone who had been exposed to tear gas. ECF No. 63-1 ¶ 12; ECF No. 64-1 ¶¶ 76, 80, 81. After about five minutes of helping the person rinse his eyes, Plaintiffs and Villhauer started to slowly make their way north back toward the bar walking by several people. ECF No. 63-1 ¶¶ 15, 19; ECF No. 64-1 ¶¶ 81, 84, 86.

Meanwhile, Defendant House's team of fifteen officers walked west from the Capitol until they reached the corner of Locust and East 6th Street, at which point they loaded into two white, unmarked pickup trucks with officers sitting in the truck beds. *Id.* ¶¶ 96, 99–102; ECF No. 63-1 ¶¶ 23, 24. Defendants House and Jackson Bruckner were in the first truck while Defendant Kaleb Schultz was in the second. ECF No. 63-1 ¶ 23. House directed his team to drive west toward the river and City Hall after receiving reports that a crowd was gathering at Locust and East 2nd Street. *Id.* ¶ 106, 107. House ordered the driver of the truck he was in to

turn north onto East 5th Street where he observed ten to fifteen people along the street, including Plaintiffs and Villhauer walking northbound on the west sidewalk and other people near the bar. *Id.* ¶¶ 109–111, 113.  One person near the three friends saw the vehicles and fled into an alley. *Id.* ¶ 112.

Defendant House testified in his deposition that it looked like Plaintiffs and Villhauer were coming from the protest at the Capitol because they had backpacks, looked sweaty,[4] and were coming from the direction of the group of people who had left the Capitol.  ECF No. 50-2 at 60.  One of the officers reported to House that he thought the trio was carrying what looked like a Molotov cocktail.  ECF No. 64-1 ¶¶ 120, 121.  House ordered the officer who was driving the first truck to stop.  *Id.* ¶ 122.  Upon seeing the trucks stop, people on the street fled up and down the street, some entered the bar, some got into a car and drove away, and others— including Plaintiffs—continued walking with their hands up.  *Id.* ¶¶ 124, 125, 129; ECF No. 63-1 ¶¶ 25, 26.

House got out and approached Plaintiffs and Villhauer believing they were carrying Molotov cocktails.  ECF No. 63-1 ¶¶ 27; ECF No. 64-1 ¶¶ 122, 123.  As the officers approached, Plaintiffs and Villhauer continued walking toward the entrance of the bar with their hands up. ECF No. 63-1 ¶¶ 21, 25.  Defendant House ordered the friends to "Drop it!" and "Get on the ground!" while aiming his rifle at them.  ECF No. 64-1 ¶ 126; *see also* ECF No. 63-1 ¶¶ 27–29. Plaintiffs and Villhauer complied with House's commands and lied face down on the ground. ECF No. 63-1 ¶ 30; ECF No. 64-1 ¶ 128.  Other officers quickly surrounded the trio.  *Id.* ¶ 127. House ordered the friends to put their hands behind their heads, and they complied.  *Id.* ¶ 131.

---

[4] Plaintiffs identify this fact as material and dispute it.  *See* ECF No. 64-1 ¶ 115 (denying this fact and noting that body camera footage does not show that any of the three friends were "noticeably sweaty or otherwise overheated" and none of the other officers recalled the men being sweaty or short of breath). For purposes of this Order, the Court concludes this fact, while disputed, is not material.

He then ordered officers to handcuff them, secure a perimeter around them, and clear the bar. *Id.* ¶¶ 132, 136, 137; ECF No. 63-1 ¶¶ 31, 34. After they were handcuffed, the officers questioned Plaintiffs and Villhauer about what they had with them. *Id.* ¶ 135. House picked up one of the spray bottles, sniffed it, and inquired about the contents of both bottles. ECF No. 63-1 ¶¶ 36, 38, 39; ECF No. 64-1 ¶¶ 138–40. Villhauer responded one bottle contained milk of magnesia and water and the other contained baking soda and water. ECF No. 63-1 ¶ 40; ECF No. 64-1 ¶¶ 138, 139. After smelling the contents of the bottles, House determined they did not contain an accelerant and therefore were not Molotov cocktails. ECF No. 63-1 ¶ 41. The friends admitted to having first-aid supplies in their possession. *Id.* ¶ 141. Officers then helped them up and searched them. *Id.* ¶¶ 144, 145. House decided to arrest Plaintiffs and Villhauer. ECF No. 63-1 ¶ 53; ECF No. 64-1 ¶ 146. He ordered officers to secure them and await transport. *Id.* ¶ 147; ECF No. 63-1 ¶ 49. Defendant Bruckner handcuffed Plaintiff Luong. ECF No. 63-1 ¶ 33. Defendants Bruckner and House then got back into the trucks with other officers and left. ECF No. 64-1 ¶¶ 148, 150, 151; ECF No. 63-1 ¶ 50. Defendant Schultz had all three sit on a bench outside the bar and took their information. *Id.* ¶¶ 152, 154; ECF No. 63-1 ¶¶ 59, 60. Once a transport vehicle arrived, the friends complied with orders to get in without incident. *Id.* ¶ 159.

It was shortly after midnight on June 2, when House reported that he had three individuals in custody outside the bar. *Id.* ¶ 161. Although there was some initial confusion among the officers as to what the charges would be, *see* ECF No. 63-1 ¶¶ 55–58, Plaintiffs and Villhauer were all eventually charged with failure to disperse, in violation of Iowa Code section 723.3, *id.* ¶¶ 163, 164; *see id.* ¶ 158; ECF No. 63-1 ¶¶ 62, 63. Plaintiffs subsequently each entered into a "deferred prosecution plea agreement" in which "the State would dismiss the case in six months if Defendant picked up no additional criminal charges." ECF No. 63-1 ¶ 81.

Thereafter, the Polk County District Court dismissed the criminal charges filed against each Plaintiff. *Id.* ¶ 82.

Plaintiffs filed an eleven-count petition in the Iowa District Court for Polk County asserting claims against the City of Des Moines, DMPD Chief Dana Wingert, and several known and unknown officers of the DMPD. ECF No. 1-1 at 15–37. Defendants removed the petition to this Court under 28 U.S.C. § 1441(a). ECF No. 1. Plaintiffs have amended their complaint multiples times to clarify their claims and voluntarily dismiss several counts and defendants from this action. *See* ECF Nos. 12 (amending petition to allege additional factual allegations and legal basis under the Iowa Constitution), 25 (amending petition to name previously unknown officers), 37 (amending petition to dismiss certain individual officers and common-law claims of malicious prosecution, abuse of process, assault and battery, and defamation), 59 (amending petition to dismiss the City and specific individual officers and federal and state claims of retaliation and deliberate indifference). In the operative Fourth Amended Petition, Plaintiffs allege violations of their civil rights under the U.S. Constitution and the Iowa Constitution and a common-law claim for false arrest against Defendants House, Bruckner, and Schultz in their official and individual capacities. Specifically, Plaintiffs allege a claim for illegal seizure under 42 U.S.C. § 1983 in violation of the Fourth Amendment to the U.S. Constitution (Count I); an illegal-seizure claim in violation of article I, section 8 of the Iowa Constitution (Count II); and a claim for false arrest/imprisonment in violation of Iowa law (Count III). ECF No. 59 at 12–14. Plaintiffs and Defendants have filed cross-motions for summary judgment. ECF Nos. 50, 55.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which

summary judgment is sought." Rule 56(a) mandates the entry of summary judgment upon motion after there has been adequate time for discovery "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). A disputed issue is "genuine" when the evidence produced "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." *See id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 510 (8th Cir. 2015) (quoting *Anderson*, 477 U.S. at 248). "Where . . . the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015) (citation omitted).

"In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins. Co.*, 536 F.3d 939, 943–44 (8th Cir. 2008) (citation omitted). Rather, the court only determines whether there are any disputed issues concerning the existence of material facts and, if so, whether those disputes are genuine. *See Anderson*, 477 U.S. at 251–52; *see also Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987)

("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").  Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish [a genuine dispute as to] the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Particularly in the presence of competing cross-motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial.  In general, "the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *accord* 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (4th ed., Apr. 2022 Update).  Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion.  *See* Wright & Miller, *supra*, § 2720.  In this matter, then, "each [party's] motion must be evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law."  *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001) (citing *Wermager*, 716 F.2d at 1211).  Thus, when considering Defendants' Motion, the Court views the record in the light most favorable to Plaintiffs, and when considering Plaintiffs' Motion, the Court views the record in the light most favorable to Defendants.

III.    ANALYSIS

Plaintiffs sue Defendants for damages alleging Defendant officers violated their rights under the Fourth Amendment to the U.S. Constitution and article I, section 8 of the Iowa

Constitution by arresting them without probable cause. Defendants move for summary judgment on grounds of federal qualified immunity and state law immunity under Iowa Code chapter 670. Plaintiffs move for partial summary judgment asking this Court to decide all the remaining claims as a matter of law except for the amount of Plaintiffs' damages.

### A. Defendants' Motion for Summary Judgment

Defendants argue that, because they had sufficient information to establish probable cause for Plaintiffs' warrantless arrests, Plaintiffs' Fourth Amendment rights were not violated and Defendants are therefore entitled to qualified immunity and judgment as a matter of law.

#### 1. Federal Claim

Congress passed the Civil Rights Act of 1871, also known as the Ku Klux Klan Act, to assist victims of racial violence in vindicating their right to equal protection under the law. Ch. 22, §1, 17 Stat. 13. The Act was codified under 42 U.S.C. § 1983, which states:

> Every person who, under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, it is undisputed Defendants acted under color of law in arresting Plaintiffs. ECF No. 59 ¶¶ 3–5; ECF No. 41 ¶¶ 3–5; ECF No. 60 at 16 n.3; *see Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir. 1997) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising

his responsibilities pursuant to state law." (quoting *West*, 487 U.S. at 49–50)). Thus, the Court need only determine whether Plaintiffs have sufficiently alleged a violation of their rights as secured by the Fourth Amendment to the U.S. Constitution.

In the operative complaint, Plaintiffs sue Defendants House, Bruckner, and Schultz in their official and individual capacities.[5]  *See* ECF No. 59 ¶¶ 3–5. Under § 1983, law enforcement officers may be sued "in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). Suits against officers in their official capacities are merely suits against the officers' employer—in this case, the City of Des Moines. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978); *Johnson*, 172 F.3d at 535. Governmental entities like the City of Des Moines cannot be held vicariously liable under § 1983 for the unconstitutional acts of their officers. *Monell*, 436 U.S. at 691. Instead, Plaintiffs must identify an unconstitutional policy or custom. *See Rogers v. City of Little Rock*, 152 F.3d 790, 800 (8th Cir. 1998) ("Liability for city officials in their official capacities is another form of action against the city, and it requires [a] showing that a policy or custom caused the alleged violation." (citing *Monell*, 436 U.S. at 690 n.55)). Plaintiffs have voluntarily dismissed their *Monell* claims against the City and no longer allege the City had an unconstitutional policy or custom that violated their rights. *See* ECF Nos. 47, 53. Because Plaintiffs do not allege an unconstitutional policy or custom, the Court dismisses Plaintiffs' claims against Defendants House, Bruckner, and Schultz in their official capacities and will

---

[5] In their Resistance to Plaintiffs' Motion, Defendants assert that Plaintiffs "have effectively waived any claims against the officers in their individual capacities" by agreeing that Defendants were acting under color of law. ECF No. 61-1 at 27. As Plaintiffs correctly point out, § 1983 "liability attaches . . . to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority *or misuse it*.'" *Nat'l Collegiate Athetic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (emphasis added). Thus, police officers can still act under color of law *and misuse their authority* leading them to be personally liable for such misuse.

analyze only Plaintiffs' claims against Defendants in their individual capacities.[6]  *See Reehten v. Buck*, 163 F.3d 602, 1998 WL 738329, at *1 (8th Cir. 1998) (per curiam) (construing the plaintiff's complaint, which did not specify whether the officers were sued in their official or individual capacity, as an official-capacity claim, and affirming the dismissal of the complaint because it failed to plead an unconstitutional policy or custom).

Next, a plaintiff must plead and allege facts demonstrating that each individual officer, through his own personal involvement in the alleged unconstitutional conduct, violated the plaintiff's civil rights.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Molina v. City of St. Louis*, 59 F.4th 334, 344 (8th Cir. 2023); *see also Triplett v. Azordegan*, 570 F.2d 819, 823 (8th Cir. 1978) ("A defendant will not be held liable under 42 U.S.C. § 1983 unless he was personally involved in causing the deprivation of a constitutional right.").  There is no dispute in this case that Defendants House, Bruckner, and Schultz were all personally involved in Plaintiffs' arrests and therefore each could be held individually liable.

Defendants assert they are each entitled to qualified immunity because House—as the commanding officer who made the decision to arrest Plaintiffs—had probable cause to arrest Plaintiffs for failure to disperse and Bruckner and Schultz—as assisting officers—reasonably relied on House's assessment.  *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017) ("Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable.").  Alternatively, Defendants assert they had probable cause to arrest Plaintiffs for violating Polk

---

[6] Even if Plaintiffs had alleged an official-capacity claim, the City cannot be held liable because the Court concludes below that Defendants House, Bruckner, and Schultz are entitled to qualified immunity.  *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (noting that, "in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim"); *see also Turpin v. County of Rock*, 262 F.3d 779, 784 (8th Cir. 2001) (concluding that, because the district court properly granted officers summary judgment on qualified-immunity grounds, the county likewise was entitled to summary judgment).

County's Curfew Order. Therefore, Defendants contend, because they had probable cause to arrest Plaintiffs, the arrests were reasonable and did not violate the Fourth Amendment.

"[G]overnment officials performing discretionary functions," such as the police officers involved in this case, "generally are shielded from [personal] liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Under well-established precedent, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S. Ct. 577, 589–90 (2018) (citation omitted); *see Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 835 (8th Cir. 2021). The Court may analyze the two prongs of the qualified-immunity test in any order, but both prongs must be satisfied for Plaintiffs to establish that Defendants are not entitled to qualified immunity. *Quraishi*, 986 F.3d at 835.

Whether the facts alleged support a claim for a violation of any clearly established statutory or constitutional right at the time an action occurs is a legal question for the court to determine. *Harlow*, 457 U.S. at 818; *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). This step in the analysis "is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." *Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008). "In determining whether a right is clearly established, [a court] ask[s] whether it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted." *Frye v. Kansas City Mo. Police Dep't*, 375 F.3d 785, 789 (8th Cir. 2004). Proving a constitutional right was clearly established at the time a government official acted unlawfully is a high burden for plaintiffs to meet—"[t]here must be

'precedent,' 'controlling authority,' or a 'robust consensus of cases of persuasive authority.'"
*Quraishi*, 986 F.3d at 835 (quoting *Wesby*, 138 S. Ct. at 589–90). In other words, caselaw "must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The U.S. Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

Here, Plaintiffs' federal claim turns on whether their warrantless arrests violated their Fourth Amendment rights to be free from unreasonable seizure, that is, whether Defendants had probable cause—or at least arguable probable cause—to arrest Plaintiffs.[7] In other words, if it was not clearly established on June 1, 2020, that Defendants' conduct in arresting Plaintiffs under the specific circumstances present in this case violated Plaintiffs' Fourth Amendment rights not to be arrested without a warrant or probable cause, then Defendants are entitled to qualified immunity. *See Brown v. City of St. Louis*, 40 F.4th 895, 901 (8th Cir. 2022) (citing *Toole v. City of Atlanta*, 798 F. App'x 381, 385 (11th Cir. 2019) (per curiam)). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. An arrest made without a warrant is unreasonable and violates the Fourth Amendment unless it is supported by probable cause. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (per curiam). "Probable cause exists to make a

---

[7] Plaintiffs do not dispute the officers' mistaken belief that the spray bottles carried by Plaintiffs were Molotov cocktails justified an investigatory stop. ECF No. 60 at 17; *see also* ECF No. 64-1 ¶ 162 (admitting "that suspicion of Molotov cocktails would be a good reason for officers to stop someone"). Rather, Plaintiffs contend the officers did not have "further specific, articulable facts [to] justify[] the continued detention and arrest of [Plaintiffs] for failure to disperse. ECF No. 60 at 17.

warrantless arrest 'when the totality of the circumstances at the time of the arrest "are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."'" *Ehlers*, 846 F.3d at 1009 (citation omitted).  In making this determination, courts must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation omitted).  Courts are instructed not to "engage[] in an 'excessively technical dissection' of the factors supporting probable cause." *Wesby*, 138 S. Ct. at 588 (quoting *Gates*, 462 U.S. at 234).  Rather, courts view the "circumstances as a whole." *Id.*  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243–44 (1983).  All reasonable inferences about a person's suspicious behavior may be considered. *E.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).  Officers are afforded "substantial latitude in interpreting and drawing inferences from factual circumstances." *Brown v. City of St. Louis*, 40 F.4th 895, 900 (citation omitted).  Even when probable cause is lacking, an officer will be "entitled to qualified immunity if there is at least 'arguable probable cause.'" *White v. Jackson*, 865 F.3d. 1064, 1074 (8th Cir. 2017) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)).  Arguable probable cause exists when "an officer mistakenly arrests a suspect believing [the arrest] is based in probable cause if the mistake is 'objectively reasonable.'"[8] *Ehlers*, 846 F.3d at 1009.  Courts in this Circuit typically analyze whether *actual* probable cause exists under the constitutional violation prong, while the analysis for *arguable* probable cause best fits under the clearly established prong. *Brown*, 40 F.4th at 901.

---

[8] "[I]n our circuit the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (citation omitted)).

At the time of Plaintiffs' arrests on June 1, 2020, "it [wa]s clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau*, 596 F.3d at 478. Accordingly, the Court must determine whether Plaintiffs' warrantless arrests were supported by probable cause or at least arguable probable cause.

Defendants have the burden of identifying which criminal law Plaintiffs are alleged to have violated. *See, e.g.*, *Welch v. Dempsey*, 51 F.4th 809, 813 (S.D. Iowa 2022) (concluding the defendant failed to "identify any law that [the plaintiff] was arguably violating when he pepper-sprayed her in the face"). Defendants assert there was probable cause to arrest Plaintiffs for Failure to Disperse, in violation of Iowa Code section 723.3.[9] Alternatively, Defendants contend there was probable cause to arrest Plaintiffs for violating Polk County's Curfew Order.

In response, Plaintiffs argue there was no probable cause or even arguable probable cause to arrest them for Failure to Disperse. Plaintiffs contend they were several blocks from the Capitol at the time of their arrest, they were not a part of a large group engaged in unlawful activity, and had Defendants conducted even a basic investigation into Plaintiffs' activities that night, Defendants would have discovered that Plaintiffs had not been at the Capitol and had not heard and refused to comply with the dispersal orders. Furthermore, Plaintiffs contend that their walking in the direction away from the Capitol with their hands up were actions consistent with complying with dispersal orders. With respect to the curfew violation, Plaintiffs assert they were not arrested for a curfew violation but solely for failing to disperse. Plaintiffs further argue that, because the Polk County Attorney's Office had specifically instructed officers not to make arrests simply for being away from their homes past the 9 p.m. curfew, an arrest for a curfew violation was an invalid charge. Plaintiffs contend it would be unreasonable for an officer to

---

[9] Iowa Code section 723.3 provides: "A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse. Any person within hearing distance of such command, who refuses to obey, commits a simple misdemeanor."

arrest someone for a curfew violation after being told by the prosecutor's office not to make such an arrest. Finally, Plaintiffs complain that Defendants made no effort to ascertain whether Plaintiffs fit within any of the enumerated exceptions to the mandatory curfew.

Probable cause for *any* offense is sufficient to invoke qualified immunity. *Webster v. Westlake*, 41 F.4th 1004, 1012 (8th Cir. 2022) ("[Q]ualified immunity may apply if there was probable cause or arguable probable cause to arrest [someone] for any crime at the time of the arrest."). It does not matter whether Defendant House's subjective reason for arresting Plaintiffs was for violating Iowa's failure-to-disperse law. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[An arresting officer's] subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause."); *Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) ("[T]he validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrest." (alteration in original) (quoting *United States v. Lester*, 647 F.2d 869, 873 (8th Cir. 1981)). Rather, Defendants are entitled to qualified immunity so long as probable cause or arguable probable cause exists for any offense—including a curfew violation—not just House's stated offense of Failure to Disperse.

It is undisputed that Plaintiffs were arrested just after midnight on June 2 when the county-wide curfew was in effect. ECF No. 63-1 ¶ 22; ECF No. 64-1 ¶ 161. Further, the record clearly shows Plaintiffs were not at their residence at the time of their arrests. The Curfew Order required people to be at their homes between the hours of 9 p.m. and 5 a.m. unless they were at work, traveling to or from work, experiencing a family or medical emergency, or participating in a religious activity. ECF No. 50-2 at 11–12. The order specifically permitted law enforcement officers to arrest people who violated the curfew without a warrant if the officer personally

observed the violation.[10]  *Id.* at 13.  In their depositions, Plaintiffs Luong and Raper both testified they were aware of the 9 p.m. Curfew Order prior to leaving their home between 10 and 10:30 p.m. on June 1.  *Id.* at 525, 527, 623.  Plaintiff Luong further testified that he understood he was violating the curfew order when he was at the East Village bar after 9 p.m. that night and when the trio of friends left the bar to assist people leaving the Capitol protest.  *Id.* at 540, 541. Villhauer also testified he understood he was violating the Curfew Order by being at the bar after 9 p.m.  *Id.* at 686.  Neither Plaintiff asserts they were working at the bar that night or that their presence on East 5th Street fell within any of the other limited exceptions to the Curfew Order. Plaintiff Luong testified he was not an employee of the bar.  *Id.* at 529.  He further testified that although Villhauer and Plaintiff Raper were employees of the bar, they were not working that night.  *Id.* at 529, 534.  In fact, the bar was not even open for business that night.  *Id.* at 536, 686. Plaintiff Raper did not testify that he went to the bar to work that night; rather he testified he and his friends went to the bar to be around people they were close with and to help if they could.  *Id.* at 625.  Villhauer testified the three friends went to the bar to provide first aid.  *Id.* at 680.  Thus, the record clearly shows that Defendants personally observed Plaintiffs violating the Curfew Order in their presence.  Accordingly, Defendants had probable cause to arrest Plaintiffs for a curfew violation.

---

[10] Neither party addresses whether the Curfew Order gives explicit permission for officers employed by the City of Des Moines to make an arrest for a curfew violation.  *See* ECF No. 50-2 at 13 (providing that "Polk County, Iowa authorizes any peace officer *employed thereby* . . . to arrest without warrant any person violating or attempting to violate this Curfew Order in that officer's presence" (emphasis added)).  However, it is undisputed the curfew "applie[d] to all individuals" and required all individuals to "remain in their place of residence during the hours the curfew [wa]s in effect."  *Id.* at 12. What is more, DMPD officers testified that they believed they could make valid arrests for violating the curfew.  *See* ECF No. 55-1 at 164, 226–27.  The Court concludes that even if DMPD officers were mistaken in their belief that they could make arrests for curfew violations pursuant to Polk County's Curfew Order, those beliefs were objectively reasonable and the DMPD officers had at least arguable probable cause for the arrests.

In their brief in support of their own summary-judgment motion, Plaintiffs contend a curfew violation was not a valid charge and that officers could not arrest people simply for violating the curfew. Plaintiffs rely on an e-mail sent by a Polk County Assistant Attorney the afternoon of June 2 that informed officers the Polk County Attorney's Office did not intend to prosecute charges of a curfew violation. *See* ECF No. 55-1 at 7–8. The subject line of the e-mail reads: "Charging Guidance in Response to Rioting" and the body of the e-mail "makes . . . recommendations to law enforcement." *Id.* at 7. The e-mail states that, "[r]ather than charging a curfew violation as a separate crime, [the Polk County Attorney's Office] recommend[s] the curfew be used as support for a Lawful Order by police to disperse." *Id.* at 7. The e-mail further states that, "[*f*]*or those that remain in the area after an order to disperse is issued, we recommend filing Failure to Disperse under § 723.3, which is a simple misdemeanor*." *Id.* at 8. Nowhere in the e-mail does it say an arrest for a curfew violation is not valid. Indeed, whether the Polk County Attorney's Office used its discretion to decline to pursue charges for violating curfew does not alter the fact that the Curfew Order specifically allowed law enforcement to make arrests for violating it. Moreover, the e-mail was not sent to law enforcement until almost 5 p.m. on June 2—roughly seventeen hours after Plaintiffs were arrested. *Id.* at 7.

Because Defendant House had probable cause to arrest Plaintiffs for violating the curfew order, and Defendants Bruckner and Schultz reasonably relied on House's probable-cause determination, the warrantless arrests did not violate Plaintiffs' clearly established Fourth Amendment rights to be free from unreasonable seizure. *See United State v. Rupert*, No. 20-cr-104 (NEB/TNL), 2021 WL 1341632, at *10 (D. Minn. Jan. 6, 2021) (concluding "there was probable cause for . . . police to believe that Defendant had committed a crime by violating the Curfew Order and arrest him without a warrant."); *Epps v. City & Cnty. of Denver*, 588 F. Supp.

3d 1164, 1174 (D. Colo. 2022) (agreeing that, "even if the curfew was unconstitutional, arrests for violating the curfew could not have violated plaintiffs' Fourth Amendment right against unreasonable search and seizure because the arrests were supported by probable cause"). Accordingly, the Court need not decide whether Defendants had at least arguable probable cause to arrest Plaintiffs for Failure to Disperse because there was sufficient probable cause to arrest them for violating Polk County's Curfew Order. Defendants are entitled to qualified immunity and, consequently, summary judgment as a matter of law.

### 2. State Claims

Plaintiffs allege a claim for illegal seizure in violation of article I, section 8 of the Iowa Constitution (Count II) and a common-law claim for false arrest/imprisonment (Count III). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A district court exercising original jurisdiction over federal claims also has supplemental jurisdiction over state claims which 'form part of the same case or controversy'" as the federal claims. *Starkey v. Amber Enters., Inc.*, 987 F.3d 758, 765 (8th Cir. 2021) (quoting 28 U.S.C. § 1367(a)). If a federal court dismisses all of the claims over which it has original jurisdiction, it "'may decline to exercise supplemental jurisdiction" over the state claims. § 1367(c)(3). In determining how to exercise its discretion, "the district court should consider the stage at which the federal claims were disposed of, 'the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum.'" *Marshall v. Green Giant Co.*, 942 F.2d 539, 549 (8th Cir. 1991) (quoting *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1346 (8th Cir. 1980)). "In the 'usual case' where all federal claims are dismissed on a motion for summary judgment, 'the balance of factors to be considered under the

[supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Starkey*, 987 F.3d at 765 (alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Here, the events that underly Plaintiffs' federal claim also form the basis for their state-law claims. As discussed above, Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claim—the only claim over which this Court has original jurisdiction.[11] Therefore, the Court has discretion to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

The Court declines to exercise supplemental jurisdiction in this case. Plaintiffs' state constitutional claim implicates undeveloped areas of Iowa law. Defendants contend no case has held that Plaintiffs can bring a direct cause of action for damages under article I, section 8 of the Iowa Constitution. Contrary to Defendants' assertion, another judge in this District has predicted that article I, section 8 is self-executing, meaning that individuals can bring a direct cause of action for tort damages under that section. *See Meyer v. Herndon*, 419 F. Supp. 3d 1109, 1129 (S.D. Iowa 2019) (predicting that "the Iowa Supreme Court would find article I, [section] 8 to be self-executing under the *Godfrey*[ *v. State* (*Godfrey II*), 898 N.W.2d 844 (Iowa 2017),] analysis"). What is more, the Iowa Supreme Court has permitted other plaintiffs to bring suit against municipal defendants for their officers' alleged violations of the plaintiffs' rights under article I, section 8. *See generally Baldwin v. City of Estherville* (*Baldwin IV*), 929 N.W.2d 691 (Iowa 2019) (considering a municipality's ability to assert qualified immunity as a defense to the plaintiff's claim that the officers have violated the plaintiff's right to be free from unreasonable

---

[11] The Court's holding as to Plaintiffs' federal constitutional claim is not necessarily determinative of the merits of Plaintiffs' state-law claims. As the Iowa Supreme Court has astutely recognized, "[t]he statutory standard for warrantless arrests under Iowa law is not identical to the federal constitutional standard." *Veatch v. City of Waverly*, 858 N.W.2d 1, 7–8 (Iowa 2015).

search and seizure under the Iowa Constitution); *Venckus v. City of Iowa City*, 930 N.W.2d 792, 799 n.1 (Iowa 2019) (assuming without deciding the plaintiff had brought cognizable constitutional claims for damages against a municipality for its officers' alleged violation of the plaintiff's article I, section 8 right against unreasonable search and seizure).

It is an open question, however—and one that might be especially important in this particular case—whether municipal law enforcement officers can be sued in their individual capacities. *See Wagner v. State*, 952 N.W.2d 843, 850 (Iowa 2020) ("[W]e have so far recognized a direct claim under the Iowa Constitution only against a government entity or a government official who is sued in their *official* capacity. We have never recognized a *Godfrey* claim against a government official in their individual capacity." (citations omitted)). The parties have by and large spared the Court their arguments regarding in which capacity Defendants House, Bruckner, and Schultz have been sued and the different legal standards that are applicable to each. Plaintiffs have alleged their claims against Defendants in both capacities, but neither party has attempted to distinguish—or even acknowledge—the difference between the two. The applicable law varies depending on whether Defendants are sued in their official capacities as compared to their individual ones. *See Baldwin IV*, 929 N.W.2d at 698 (holding the Iowa Municipal Tort Claims Act (IMTCA) applies to a *Godfrey* action brought against a municipal employer). The available remedies vary as well. *See id.* at 699 (concluding the IMTCA "precludes an award of punitive damages against the municipality that employed the constitutional tortfeasor"). Iowa law does not appear to require a plaintiff to allege an unlawful policy or custom to hold a municipality liable for the constitutional torts of its officers so long as the officers were acting within the scope of their employment. *See* Iowa Code § 670.2(1) (providing that "every municipality is subject to liability for its torts and those of its officers and

employees, acting within the scope of their employment or duties"). Thus, Plaintiffs may be able to state a claim against Defendants in their official capacities in state court. However, it is unclear to this Court whether Plaintiffs are still pursuing their state constitutional claim against Defendants in their official capacities. Additionally, Iowa law has not foreclosed the possibility that a direct constitutional tort damages claim can be brought against an officer in their individual capacity. *See Wagner*, 952 N.W.2d at 851 (observing that if the court declined to answer the certified questions, it "would have to answer a *different* question—namely, whether individual capacity *Godfrey* claims are available").

For these reasons, the Court believes Iowa's state courts are the best forum in which to determine the answers to the remaining questions in this case. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims in Counts II and III. The Court remands them to state court.

### B. Plaintiff's Partial Motion for Summary Judgment on Liability

Because the Court concludes Defendants are immune from suit and thus entitled to summary judgment on Plaintiffs' federal claim and exercises its discretion to remand Plaintiffs' state claims, Plaintiffs' Partial Motion for Summary Judgment as to Liability is denied.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 50) is GRANTED IN PART AND REMANDED IN PART. Plaintiffs' Partial Motion for Summary Judgment (ECF No. 55) is DENIED. Because this case was removed, the Court remands Counts II and III to the Iowa District Court for Polk County.

IT IS SO ORDERED.

Dated this 11th day of April, 2023.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT